UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
HONEEDEW INVESTING LLC,

                    Appellant,

         - against -

BARBARA ABADI,

                    Appellee.

--------------------------------------------------------x

**MEMORANDUM & ORDER**
24-CV-6143, 25-CV-0195 (PKC)

PAMELA K. CHEN, United States District Judge:

This appeal is the latest chapter of an acrimonious dispute between Barbara Abadi ("Abadi"), Appellee-Debtor, and Honeedew Investing LLC ("Honeedew"), Appellant-Creditor, concerning the collection of a $4,603,408.20 judgment that Honeedew obtained in 2017. Honeedew appeals from two orders entered by the United States Bankruptcy Court for the Eastern District of New York (Mazer-Marino, *Bankr. J.*) ("Bankruptcy Court"): one enforcing the automatic stay and holding Honeedew in contempt for violating the stay (the "Enforcement Order"); and a second imposing actual and punitive damages for Honeedew's violation of the automatic stay (the "Sanctions Order"). (Notice of Appeal, No. 25-CV-0195, Dkt. 1 (appeal of Enforcement Order); Notice of Appeal, No. 24-CV-6143, Dkt. 1 (appeal of Sanctions Order).[1]). For the reasons set forth herein, the Court affirms the Bankruptcy Court's decision enforcing, and finding Honeedew in contempt of, the automatic stay, but vacates the Bankruptcy Court's calculations of actual and punitive damages, and remands the case for determinations consistent with this decision.

---

[1] These two appeals have been consolidated by an Order of the Court under docket number 24-CV-6143. (*See* 04/25/2025 Order Consolidating Cases, No. 25-CV-0195.)

**BACKGROUND**

## I.    Factual Background

### A.    Initial State Court Action

On or about November 9, 2016, Abadi and her husband (the "Abadis"), entered into a Settlement Agreement ("Agreement") with Honeedew.   (B.R. 405–421.)[2]   As part of that Agreement, the Abadis agreed to deliver to Honeedew a promissory note of $4,603,408.20 plus interest and fees, (B.R. 405, 423), secured by a Confession of Judgment,[3] (B.R. 438–39).  Under the terms of the Agreement, if the Abadis failed to make that payment, Honeedew could file the Confession of Judgment and "proceed to enforce and collect such judgment," (B.R. 406–07), i.e. $4,603,408.20 plus interest and fees, (B.R. 438).  On April 28, 2017, the Abadis defaulted on the Agreement, (*see* B.R. 423 (maturity date); B.R. 402 (default)), and on May 17, 2017, Honeedew entered the Judgment in State Court, (*see* B.R. 102).  Honeedew then spent over six years attempting to enforce the judgment.  (B.R. 195.)

On April 4, 2024, Justice Nancy Bannon of the New York Supreme Court found the Abadis in contempt, and ordered them to pay "[Honeedew], within 30 days of the date of the service . . . , the sum of $4,603,408.23, plus statutory interest from May 17, 2017."  (B.R. 202–03.)  The Abadis did not comply.  (*See* B.R. 208–09, 211–12.)  Thus, on May 20, 2024, Justice Bannon ordered the Abadis "to be incarcerated for a period of up to four months."  (B.R. 212.)  "Incarceration," Justice Bannon explained, "is proper where . . . efforts to enforce the judgment have failed."  (B.R. 622.)

---

[2] Throughout this Memorandum and Order, "B.R." refers to the Notice of Bankruptcy Record Received, *Honeedew Investing LLC v. Abadi*, 25-CV-0195, Dkt. 2.  The page numbers for these citations refer to those found in the bottom right corner of each page of the B.R.

[3] A confession of judgment is an agreement in which a debtor, upon non-occurrence of a payment, agrees to allow a creditor to obtain a judgment against them.  *Confession of Judgment*, Black's Law Dictionary (12th ed. 2024).

Given the Abadis' failure to pay the judgment, Justice Bannon concluded that "the only other option that remains is incarceration until you purge your contempt.  That means pay what you owe."  (*Id.*)  Under Justice Bannon's May 20, 2024 order (the "Contempt Order"), the Abadis would be "immediately released" from custody "upon the purging of their contempt"—i.e., by confirming that they had paid Honeedew "the purge amount of [$]4,603,408.23, plus statutory interest of 9% from May 17, 2017."  (B.R. 212.)

### B.      Petition for Bankruptcy

On July 11, 2024, while incarcerated at the Rikers Island jail facility ("Rikers"), Abadi filed for Chapter 7 bankruptcy in the Eastern District of New York.  (B.R. 8–59.)  The bankruptcy petition was filed by Jennifer Polick, (B.R. 57, 60), who claimed that Abadi had given her power of attorney on June 17, 2024, (B.R.  60–63; *see also* B.R. 65–71 (power of attorney form)).  The same day, Abadi filed notice of the bankruptcy filing in the New York Supreme Court, stating, in part, that "any and all actions or proceedings in" the case were stayed "by virtue of 11 U.S.C. § 362(a)" ("Section 362").  (B.R. 107.)  Attorney David N. Slarskey ("Slarskey"), informed Honeedew's counsel, Eric S. Medina ("Medina"), of the bankruptcy filing the same day, asking "whether you [i.e., Honeedew] acknowledge the automatic stay and that [Abadi] should accordingly be released."  (B.R. 110.)  Medina responded, "I don't understand what you're asking me.  Please be specific."  (*Id.*)  Abadi's "bankruptcy counsel," Douglas J. Pick ("Pick")[4], replied to Medina on July 12, 2024, explaining, *inter alia*, that Abadi "has filed for Chapter 7 relief and, accordingly, there is now an automatic stay in place . . . ."  (B.R. 109.)  "Thus, any attempt to enforce the [May 20, 2024] [C]ontempt Order may, in and of itself, be a violation of the automatic

---

[4] Although Slarskey initially notified Honeedew of the Abadi's bankruptcy filing, he did not represent Abadi in that matter.  (*See* B.R. 110, 115, 117.)  Rather, Abadi's "bankruptcy counsel" is Pick.  (B.R. 108–110.)

stay and subject the petitioner (here Honeedew) to sanctions." (*Id.*) "[I]naction," Pick warned, "can also be considered a violation of the automatic stay." (*Id.*) Pick thus sought Honeedew's assistance in "having Ms. Abadi immediately released" from Rikers. (*Id.*)

### C.      Periodic Review of the Contempt Order ("State Contempt Proceedings")

On July 15, 2024, Honeedew appeared before Justice Bannon for a periodic review of the Court's Contempt Order. (B.R. 115.) The Abadis were also produced from Rikers to attend. (*Id.*) Pick argued that, to avoid violating the automatic stay, Abadi had to be released from Rikers. (*See* B.R. 129.) Slarskey argued that due to the automatic stay, "[t]here's no lawful order to enforce that judgment against M[r]s. Abadi now." (B.R. 136.) By comparison, Pick asserted, if Justice Bannon were to "keep the status quo," doing so would be essentially "taking affirmative action to maintain an enforcement tool" of the Contempt Order. (B.R. 121.)

Honeedew's other attorney, Norma Ortiz, explained to Justice Bannon that Honeedew had not "sought any affirmative relief before [the Supreme Court]." (B.R. 124.) Medina noted that although Honeedew had "intended to serve an additional subpoena on Mr. Abadi and Mrs. Abadi" and bring another application "with regards to contempt procedures," Honeedew did not do so because the Abadis had threatened Honeedew with sanctions for violating the stay. (B.R. 116.) Instead, Medina and Ortiz explained to Justice Bannon that Honeedew intended to "move before the bankruptcy court to clarify that the automatic stay does not apply for the proposition that has been asserted," (B.R. 116–17), in part because Honeedew believed Abadi's bankruptcy petition was defective, (B.R. 124–26). Ortiz further argued that "it would be a travesty for [Abadi] -- who my understanding is, based upon the date and time appeared in the case, is possibly a flight risk; to let her out until we determine if the bankruptcy petition was properly filed does not seem appropriate under the circumstances." (B.R. 126.)

Justice Bannon declined to release Abadi.  (*See* B.R. 136.)  She explained that "[a] release is an order, . . . the same thing as an order to produce.  It is an order." (B.R. 130.)  "[T]hat would be in violation" of what Justice Bannon interpreted Abadi to assert, i.e. "that nothing can be done in this case because there's a stay. . . . [E]verything is stopped and frozen."  (B.R. 127, 129.)  Justice Bannon directed the parties to reconvene in approximately one month.  (*See* B.R. 136.)

## II.      Procedural History

Four days after the hearing before Justice Bannon, Abadi moved before the Bankruptcy Court to enforce the automatic stay in the pending New York Supreme Court case, hold Honeedew "in contempt for willfully violating the automatic stay," impose "sanctions against Honeedew on account thereof," and "direct[] the immediate release of [Abadi] from incarceration."  (B.R. 146–47.)  Honeedew opposed, contending, *inter alia*, that Abadi's bankruptcy case should be dismissed because Abadi's power of attorney was not valid under New York Law, did not specifically authorize Polick to file for bankruptcy, and did not comply with the Bankruptcy Rules of Procedure.  (B.R. 230–34.)  Moreover, Honeedew asserted, Abadi's petition did not trigger an automatic stay because she was subject to a criminal contempt order.  (B.R. 235–39.)  On July 22, 2025, Abadi filed an amended petition for bankruptcy, (B.R. 3), and confirmed that she agreed to proceed through her power of attorney, (B.R. 1221–22).

### A.      Bankruptcy Court Issues Enforcement Order

On July 22, 2024, Bankruptcy Court Judge Mazer-Marino held that "[t]he filing of the voluntary petition commenced this case and stayed, pursuant to Bankruptcy Code [S]ection 362(a), all acts to enforce or collect Honeedew's Judgment from the Debtor or from assets of the [C]hapter 7 estate."  (B.R. 295.)  Judge Mazer-Marino rejected Honeedew's arguments that Abadi's petition did not trigger an automatic stay, concluding that the execution of the power of attorney was irrelevant to whether a case was commenced or whether an automatic stay applied, (B.R. 1241–

47), and that Abadi was subject to a civil contempt order, not a criminal contempt order, because she could cure her contempt by paying the debt she owed, (B.R. 1251–55).

Judge Mazer-Marino also found Honeedew in contempt for violating the automatic stay. (B.R. 1255–56.)  "Upon learning of the commencement of this bankruptcy case," Judge Mazer-Marino held, "Honeedew was obliged to cease efforts to enforce its Judgment and collect the debt owed to it by the Debtor, by, among other things, informing [Justice Bannon] that the automatic stay stayed Honeedew from enforcing or collecting its Judgment."  (B.R. 295.)  Abadi's "continu[ed] . . . incarceration" after the filing of the petition, and "Honeedew's appearance at the July 1[5]th state court hearing in opposition to the debtor's motion," violated the automatic stay. (B.R. 1255–56.)

### B.    Issuance of Sanctions Order

On December 27, 2024, Judge Mazer-Marino held a hearing to determine the sanctions that Honeedew would be subject to for violating the automatic stay.  12/12/2024 Hr'g Tr. ("Tr."), *In re Abadi*, No. 24-42873 (JMM) (Bankr. E.D.N.Y. July 22, 2024) ("*Bankr.*"), Dkt. 122.[5]  Judge

---

[5] In a bankruptcy appeal, the appellant bears the burden of designating the "items to be included in the record on appeal" and "order[ing] a transcript of such parts of the proceedings not already on file as the appellant considers necessary for the appeal."  Fed. R. Bankr. P. 8009(a)(1)(A), (b)(1)(A).  The record transmitted to the Court in this case lacked the Sanctions Order and the transcript of the 12/27/2024 Sanctions Hearing.  *See* Fed. R. Bankr. P. 8009(a)(4) (requiring record to include transcripts of oral rulings, as well as transcripts necessary to the appeal).  This failure alone is grounds for the Court to dismiss Honeedew's appeals.  *Rivera v. JP Morgan Chase*, No. 20-CV-5436 (JMA), 2021 WL 1999410, at *3 n.6 (E.D.N.Y. May 19, 2021); *Walker v. HSBC Bank USA, Nat'l Ass'n*, No. 24-CV-8477 (PKC), 2025 WL 2256654, at *4 (E.D.N.Y. Aug. 7, 2025); *In re Hawkins*, 295 F. App'x 452, 453 (2d Cir. 2008) (summary order) (explaining that Bankruptcy Rule 8001 grants a district court discretion to dismiss an appeal for failure to comply with a procedural requirement).  Nonetheless, in the interest of expediting resolution of this case, the Court takes judicial notice of documents in the Bankruptcy Court's docket, even if not part of the designated record on appeal.  *See In re Abbott*, No. 09-CV-9122 (CS), 2010 WL 11712796, at *1 n.1 (S.D.N.Y. Sep. 30, 2010) (taking "judicial notice of documents on the Bankruptcy Court's docket, even if not designated as part of the record on

Mazer-Marino again concluded that Honeedew had willfully violated the automatic stay because it "knew that a bankruptcy petition had been filed," but "did not take action . . . to inform Justice Bannon that holding [Abadi] in jail in civil contempt violated the automatic stay."  (*Id.* at 37.) Judge Mazer-Marino determined that Honeedew was informed of the applicable law via email, but "instead of taking affirmative steps to assist the debtor in obtaining release from Rikers, Honeedew took a hands[-]off approach." (*Id.* at 40.)  As to Honeedew's affirmative statements before Justice Bannon—declaring that the stay was "void ab initio" and that it had its "doubts as to the validity of the petition"—Judge Mazer-Marino concluded that, "if they didn't encourage Justice Bannon to keep the status quo in place, . . . [they] gave her an incorrect statement of the law." (*Id.* at 38.)

"[A]s a result of Honeedew's willful violation of the automatic stay," Judge Mazer-Marino imposed "$21,642.50 in attorneys' fees, plus an additional $110.00 in costs and expenses, as actual damages incurred by the Debtor." (Sanctions Order, No. 25-CV-0195, Dkt. 1-1, at 10.[6])  This sum represented the 45.1 billable attorney hours Abadi's attorney spent addressing the automatic stay, as well as out-of-pocket expenses the attorneys incurred related to this work.  Mot. for Sanctions for Violation of the Automatic Stay ("Sanctions Mot."), *Bankr.*, Dkt. 67, at 11–13.[7]  Judge Mazer-Marino rejected Honeedew's argument that these fees were "routinely born by debtors," Mem. of Law in Opp'n to Sanctions Mot. ("Sanctions Opp'n"), *Bankr.*, Dkt. 94, at 18, because, she explained, the burden "is never on the debtor to secure the protection of the automatic stay," Tr. at

---

appeal"); *cf In re Emmons-Sheepshead Bay Dev. LLC*, 518 B.R. 212, 217–219 (E.D.N.Y. 2014) (affording district courts discretion to hear a case in spite of incomplete record).

[6] The page numbers for this citation refer to those found in the bottom right corner of each page.

[7] Abadi stated that "she has suffered additional actual damages" in addition to the attorneys' fees, but declined to pursue them at the time.  Sanctions Mot., Dkt. 67, at 13 n.6.

44:9–22, *Bankr.*, Dkt. 122.  Judge Mazer-Marino similarly dismissed Honeedew's contention that Abadi had inflated actual costs by delaying seeking relief before the Bankruptcy Court, *see* Sanctions Opp'n, *Bankr.*, Dkt. 94, at 15–16, explaining that she did not "see anything in the record that would support [the] contention that . . . Abadi chose to stay in Rikers longer to make herself a more sympathetic character," Tr. at 47:14–16, *Bankr.*, Dkt. 122.  Instead, Judge Mazer-Marino found, the record reflected "how difficult it was [for Abadi] to get paperwork to and from her attorney[, which] basically caused some delay." (*Id.*)  The Court also imposed "$75,000.00 as punitive damages, representing $7,500.00 for each of the ten (10) days [Abadi] was incarcerated following the July 15, 2024 New York state court hearing at which Honeedew willfully violated the automatic stay." (Sanctions Order, No. 25-CV-0195, Dkt. 1-1, at 10.)

### C.    Appeal and Consolidation

Honeedew timely appealed the Bankruptcy Court's Enforcement Order.  (Notice of Appeal, No. 25-CV-0195, Dkt. 1.)  Separately, Honeedew timely appealed the Bankruptcy Court's Sanctions Order.  (Notice of Appeal, No. 24-CV-6143, Dkt. 1.)  On April 25, 2025, the Court consolidated the two appeals under the docket number 24-CV-6143.  (*See* 04/25/2025 Order Consolidating Cases, No. 25-CV-0195.)

### STANDARD OF REVIEW

District courts have appellate jurisdiction over "final judgments, orders, and decrees" entered in bankruptcy court.  28 U.S.C. § 158(a).  The Court reviews a bankruptcy court's legal conclusions concerning the imposition of an automatic stay *de novo*.  *Sharf v. BC Liquidating, LLC*, No. 14-CV-7320 (JMA), 2015 WL 5093097, at *4 (E.D.N.Y. Aug. 28, 2015) (citing *In re Weber*, 719 F.3d 72, 75 (2d Cir. 2013), *abrogated on other grounds by City of Chicago v. Fulton*, 592 U.S. 154, 157 (2021)).  Whether a creditor violated an automatic stay is also a question of law the district court reviews *de novo*.  *In re Adomah*, 368 B.R. 134, 137 (S.D.N.Y. 2007); *In re*

8

*Windstream Holdings, Inc.*, 634 F. Supp. 3d 99, 104 (S.D.N.Y. 2022), *aff'd*, 105 F.4th 488 (2d Cir. 2024).  "A bankruptcy court's decision to impose sanctions is reviewed for abuse of discretion." *In re DiBattista*, 33 F.4th 698, 702 (2d Cir. 2022) (citing *Solow v. Kalikow* (*In re Kalikow*), 602 F.3d 82, 91 (2d Cir. 2010)); *In Re Highgate Equities, Ltd.*, 279 F.3d 148, 151 (2d Cir. 2002).  A bankruptcy court abuses its discretion where "(1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (internal citations omitted).  A factual finding is clearly erroneous where the Court has been left with the "definite and firm conviction that a mistake has been committed." *Gasson v. Premier Cap., LLC*, 43 F.4th 37, 41 (2d Cir. 2022) (citation omitted).

## DISCUSSION

### I.    Effective Date and Scope of the Automatic Stay

Honeedew claims that Abadi's petition did not trigger an automatic stay because it did not commence a bankruptcy case, as Abadi's power of attorney was not validly executed under New York law, did not explicitly authorize the agent to file a bankruptcy petition, and did not comply with Bankruptcy Rule 1004.1, which allows infants and incompetent persons to file for bankruptcy through a power of attorney.  (*See* Appellant's Br. ("Stay Br."), Dkt. 12, at 23–26; Appellant's Br. ("Sanctions Br."), Dkt. 10, at ECF[8] 22–25; Appellant's Reply Br. ("Sanctions Reply"), Dkt. 9, at 9–10; *see also* B.R. 230–31.)[9]  In the alternative, Honeedew argues that the automatic stay did not

---

[8]  Because Honeedew's brief does not provide page numbers, the Court uses the pagination generated by the Court's CM/ECF docketing system.

[9]  Because Honeedew's brief is not a model of clarity, the Court has construed their arguments as stated herein.

9

apply to the proceedings before Justice Bannon because Abadi was incarcerated pursuant to a criminal contempt order.  (Stay Br., Dkt. 12, at 27–29.)  For the following reasons, the Court concludes that, regardless of whether Abadi's power of attorney was validly executed or compliant with Rule 1004.1, an automatic stay went into effect when her petition was filed with the Bankruptcy Court on July 11, 2024.

###### A.    Legal Standard

A voluntary case for bankruptcy is commenced "by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter."  11 U.S.C. § 301(a).  Once such a petition is filed, it creates an automatic stay of "the enforcement[] against the debtor . . . of a judgment obtained before the commencement of the case under this title," as well as "the commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." *Id.* § 362(a)(1), (2).  "Because 'the automatic stay is imposed by Congressional mandate and not by court order,' no court action is needed for the stay to become effective." *In re Fogarty*, 39 F.4th 62, 71 (2d Cir. 2022) (quoting *In re Colonial Realty Co.*, 980 F.2d 125, 137 (2d Cir. 1992)). Certain types of proceedings, however, are not automatically stayed by the filing of a voluntary petition for bankruptcy. *See* 11 U.S.C. § 362(b).  For example, the automatic stay does not apply to "the commencement or continuation of a criminal action or proceeding against the debtor," *id.* § 362(b)(1), such as criminal contempt proceedings.

**B.      The Automatic Stay Came into Effect Once Abadi Filed Her Petition**

1.      The Automatic Stay Came into Effect Regardless of Whether Abadi's Petition Was Filed Pursuant to a Properly-Executed Power of Attorney and Bankruptcy Rule 1004.1.

The Court concludes that the automatic stay took effect *regardless* of whether Abadi's power of attorney complied with state law or Bankruptcy Rule 1004.1.  The Second Circuit's decision in *In re Zarnel*, 619 F.3d 156 (2d Cir. 2010) compels this conclusion.

In *Zarnel*, the petitioners had filed for voluntary bankruptcy under 11 U.S.C. § 301 ("Section 301") but failed to attach the requisite credit-counseling certificate.[10]  619 F.3d at 158–59.  On appeal, the parties disputed, *inter alia*, "whether the automatic stay takes effect when a petition is filed by a debtor ineligible under [11 U.S.C. ]§ 109(h)."  *Id.* at 164–70.  The bankruptcy court had held that by failing to comply with the procedural requirement of credit-counseling and attaching the credit-counseling certificate, the debtors were "ineligible" for bankruptcy protection and that the automatic stay should not have taken effect.  *Id.* at 159–60; *see also In re Elmendorf*, 345 B.R. 486, 491–93 (Bankr. S.D.N.Y. 2006) (observing debtors failed to obtain the requisite

---

[10] An entity "may be a debtor" under Section 301 by complying with various statutory requirements, *see, e.g.*, 11 U.S.C. § 109 (describing who "may be a debtor").  One such requirement, set out in 11 U.S.C. §§ 109(h) and 521(b)(1), is obtaining credit counseling prior to filing a bankruptcy petition.  *See Zarnel*, 619 F.3d at 164; 11 U.S.C. § 109(h)(1) ("[A]n individual may not be a debtor under this title unless such individual has, during the 180-day period ending on the date of filing of the petition by such individual, received from an approved nonprofit budget and credit counseling agency described in section 111(a) an individual or group briefing . . . that outlined the opportunities for available credit counseling and assisted such individual in performing a related budget analysis.").  The prospective debtor must provide a credit counseling certificate, i.e., "a certificate from the approved nonprofit budget and credit counseling agency that provided the debtor services under section 109(h) describing the services provided to the debtor."  11 U.S.C. § 521(b)(1); *see also Zarnel*, 619 F.3d at 158–59 (describing debtor's failure to comply with 11 U.S.C. § 521(b) and 11 U.S.C. § 109(h)(3)(A)).  Alternatively, the debtor must submit to the court "a certification" describing, *inter alia*, exigent circumstances warranting a waiver of the counseling requirement.  11 U.S.C. § 109(h)(3)(A).  An individual who fails to comply with the requirements of Section 109 is not "eligible" to be a debtor and thus not entitled to relief.  *See in re Barnet*, 737 F.3d 238, 247–48 (2d Cir. 2013) (compiling authorities); *Zarnel*, 619 F.3d at 166.

11

credit-counseling certificates as required by 11 U.S.C. §§ 109(h), 521(b)), *aff'd sub nom. Adams v. Finlay*, No. 06-CV-6039 (CLB), 2006 WL 3240522 (S.D.N.Y. Nov. 3, 2006), *vacated and remanded sub nom. Zarnel*, 619 F.3d 156. The Second Circuit reversed. It held that the filing of a bankruptcy petition commenced the case and triggered an automatic stay, even if the petitioner was not eligible to "be a debtor under the Bankruptcy Code." *Zarnel*, 619 F.3d at 166–67, 170 (citing 11 U.S.C. § 362(a)). This conclusion, *Zarnel* explained, flowed directly from the Bankruptcy Code: "The term petition means petition filed under [S]ection 301 . . . of this title, as the case may be, *commencing a case under this title.*" *See id.* at 166 (emphasis added) (internal quotation marks omitted) (quoting 11 U.S.C. § 101(42)). "Section 362(a) of the Code states that 'a petition filed under [S]ection 301 . . . operates as a stay.'" *Id.* at 165 (quoting 11 U.S.C. § 362(a)). Section 362(b), which lists the "circumstances under which the filing of a petition does not operate as a stay," makes no mention of a "debtor's ineligibility." *Id.* at 170. "Moreover, none of the mechanisms outlined in the remainder of the statute for confirming the existence of a stay or for granting relief from one address anything related to the ineligibility of a debtor." *Id.* "Thus, a petition filed under [Section 301] both 'operates as a stay,' and commences a bankruptcy case." *Id.* at 166 (internal citations omitted). Here, *Zarnel*'s reasoning dictates that an automatic stay went into effect when Abadi filed her petition under Section 301—even if her petition did not comply with Rule 1004.1 or her power of attorney was improperly executed under state law.

Honeedew argues that *Zarnel* is inapposite and that *In re Vitagliano*, 303 BR 292, 293 (Bankr. W.D.N.Y. 2003) establishes that no automatic stay came into effect. (Stay Br., Dkt. 12, at 23–24; Sanctions Br., Dkt. 10, at ECF 22–23.) This argument fails for two reasons. First, *Vitagliano* repudiates Honeedew's argument that an automatic stay did not come into effect because Abadi's power of attorney was not validly executed under New York law. In that case,

12

the bankruptcy court confronted whether a "person's attorney-in-fact may effectively commence a bankruptcy case" for that person. 303 BR at 292. Debtor's counsel argued that "under state law, his mother's signature as his attorney-in-fact suffices to constitute his signature on a document." *Id.* at 292–93. The *Vitagliano* court determined that "it is not for the State of New York to prescribe what constitutes the satisfaction of the requirement of [Section] 301" and therefore what commences a case. *Id.* at 293. So too here. Honeedew's reliance on New York law governing execution of power of attorney agreements does not bear on whether a federal bankruptcy case commences.

Second, *Vitagliano* is not distinguishable from *Zarnel*. Honeedew asserts that *Zarnel* is inapplicable because it concerns the "eligibility" of the debtor for relief, whereas *Vitagliano* and this instant case concern "the actual *authority* to *commence* the case" on behalf of a debtor. (Sanctions Reply, Dkt. 9, at 9 (first emphasis added); *see also* Stay Br., Dkt. 12, at ECF 23–27.) Not quite. *Vitagliano*, like *Zarnel*, concerns whether a bankruptcy case is commenced where a petition fails to comply with procedural requirements as set out in the Bankruptcy Code and Rules. *See Vitagliano*, 303 B.R. at 293. The *Vitagliano* court stated that it would determine whether a case was commenced if a petition complied with "Bankruptcy Law and Rules." *See id.* The *Vitagliano* court consulted Bankruptcy Rule 1004.1, which allows a representative to "file a voluntary petition on behalf of [an] infant or incompetent person," and Bankruptcy Rule 9010(c), which discusses the "authority" of an attorney-in-fact "to represent a creditor," and determined that a debtor could file a petition through an attorney-in-fact only if he was incompetent or an infant. *See id.* (emphasis omitted) (first quoting Fed. R. Bankr. P. 1004.1; and then quoting Fed. R. Bankr. P. 9010(c)). Because the debtor was not incompetent or an infant, the court concluded, his petition did not comply with Rule 1004.1, and therefore the case did not commence. *See id.* at

13

293–94.  Although *Zarnel* concerned a debtor's failure to meet a *different* procedural requirement, the essential question it addressed was the same as *Vitagliano*: whether a debtor who fails to abide by the Bankruptcy Code and its Rules, "and yet files a bankruptcy petition has . . . actually commenced a case."  *See Zarnel*, 619 F.3d at 164.[11]  *Zarnel*, unlike *Vitagliano*, answered in the affirmative.  *Id.* at 166–67.  To the extent that *Zarnel* and *Vitagliano* are in tension, *Zarnel* post-dates *Vitagliano*, and binds the Court.  *Zarnel* makes clear that a petition's compliance with the Bankruptcy Rules or Code has *no bearing* on whether the petitioner can commence a case and, thus, trigger an automatic stay.  *See id.* at 166–67, 170.

---

[11] At other points in its briefing, Honeedew appears to conflate *Vitagliano* with a smattering of cases suggesting that a case is not commenced where a power of attorney does not explicitly authorize the attorney-in-fact to file for bankruptcy.  (*See* Sanctions Br., Dkt. 10, at ECF 22–24; Stay Br., Dkt. 12, at 23–27.)  However, the analysis in these cases is divorced from relevant statutory authority.  *See In re Morgan*, 182 B.R. 4, 5 (Bankr. S.D.N.Y. 1995) (determining that there was no "voluntary" bankruptcy case before the court, where power of attorney did not explicitly authorize filing for bankruptcy on behalf of client, but engaging in no analysis of the meaning of "voluntary" under Section 301 of the Bankruptcy Code); *In re Raymond*, 12 B.R. 906, 907 (Bankr. E.D. Va. 1981) (acknowledging that "there is no[]" law applicable to the situation and citing to Virginia agency law); *In re Sullivan*, 30 B.R. 781, 782 (Bankr. E.D. Pa. 1983) (citing *Raymond*, 12 B.R. at 906); *In re Ballard*, No. I-87-0718, 1987 WL 191320, at *1 (Bankr. N.D. Cal. Apr. 30, 1987) (basing analysis on "equity" (quoting *Sullivan*, 30 B.R. at 782)); *In re Brown*, 163 B.R. 596, 597–98 (Bankr. N.D. Fla. 1993) (citing to caselaw, not the text of the Bankruptcy Code, in discussing whether to "permit a party other than the debtor to sign and file a petition under a power of attorney" (citing *Ballard*, 987 WL 191320, at *1)); *in re Curtis*, 262 B.R. 619, 622–23 (Bankr. D. Vt. 2001) (taking a similar approach and observing that "[s]ome courts recognize the effectiveness of a power of attorney only if ratified by the debtor" while others "scrutinize the empowering document for express language specifically authorizing the filing of bankruptcy" (citing, *inter alia*, *Raymond*, 12 B.R. at 906)).  The Court finds these cases unpersuasive and instead follows *Zarnel*'s well-reasoned analysis of the statutory text and purpose of the automatic stay.  *See Zarnel*, 619 F.3d at 171 (explaining that its interpretation of Section 301 and 362 gives meaning to the purpose of the automatic stay); *see also Wekell v. United States*, 14 F.3d 32, 33 (9th Cir. 1994) (concluding that the automatic stay went into effect even when the debtor's petition was filed pursuant to a power of attorney that did not explicitly authorize the attorney-in-fact to file for bankruptcy because "[i]f such latent defects [in the power of attorney] could undermine the validity of the stay," the purpose of the automatic stay would be undermined); *In re Rich*, No. 10-64847-B-7, 2012 WL 8249563, at *5 (Bankr. E.D. Cal. Aug. 29, 2012) (reasoning that the "automatic stay is applicable even though the petition was filed by a person without authority to do so" (citing *Wekell*, 14 F.3d at 33)).

A consideration of the "purpose and framework of the stay," *Zarnel*, 619 F.3d at 171, bolsters the conclusion that *Zarnel* is dispositive.  "Nothing is more basic to bankruptcy law than the automatic stay and nothing is more important to fair case administration than enforcing stay violations."  *In re Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 112 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 445 B.R. 130 (S.D.N.Y. 2011); *see Fogarty*, 39 F.4th at 80 (describing automatic stay as "one of the fundamental debtor protections" (quoting *E. Refractories Co. Inc. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998))).  An automatic stay "provid[es] debtors with a fresh start, protect[s] the assets of the estate, and allow[s] the bankruptcy court to centralize disputes concerning the estate."  *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 109 (2d Cir. 2006); *In re Colonial Realty Co.*, 980 F.2d 125, 133 (2d Cir. 1992) (explaining that an automatic stay aims to "prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts" (citation omitted)).  The automatic stay also protects creditors, as, without such a stay, "creditors would be able to pursue their own remedies against the debtor's property," with those "act[ing] first . . . obtain[ing] payment . . . in preference to and to the detriment of other creditors."  *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) (citation omitted).  "If it were unclear whether the stay was in place immediately following a debtor's filing for bankruptcy," creditors would be incentivized to "continue their collection efforts," and undermine a "fair distribution of assets."  *Zarnel*, 619 F.3d at 171; *see Wekell*, 14 F.3d at 33–34 (similarly concluding that such uncertainty as to the stay would place creditors "in a difficult position": either to "enforce their claim and risk violating what turns out to be a valid stay," or "withhold enforcement of their claim and risk the running of the statute of limitations if it turns out the stay was ineffective").  To avoid that outcome, the automatic stay is intentionally broad—even petitions filed in bad faith may

15

shelter under the protections of the automatic stay, which will *only* be lifted "after notice and a hearing." *See* 11 U.S.C. § 362(d)(1) (directing bankruptcy courts to "terminat[e], annul[], modify[], or condition[] [an automatic] stay" for cause); *see also In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286–87 (2d Cir. 1990) (considering "bad faith" in assessing whether there was cause to lift a stay); *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 25 (2000) (same); *Alanis v. Nelson*, No. 11-CV-2583 (JEM), 2011 WL 13220324, at *2 (C.D. Cal. May 11, 2011) ("The automatic stay applies even if the bankruptcy petition was *ultra vires* or in bad faith." (citing *Wekell*, 14 F.3d at 33)).[12]

Thus, even if Abadi's power of attorney was not properly executed pursuant to New York law and the Bankruptcy Rules, Abadi's bankruptcy case still commenced, and an automatic stay went into effect, when she filed her petition on July 11, 2024. To the extent that defects in the petitioner's power of attorney exist, those may serve as reason to dismiss the case or seek relief from the automatic stay at a later point in the bankruptcy proceeding. *See, e.g.*, *Wekell*, 14 F.3d at 32 (explaining that "the Bankruptcy Code provides a relatively simple procedure for resolving any disputes as to [an automatic stay's] effectiveness: a relief-from-stay hearing"); *see also* 11 U.S.C. § 707(a) (allowing a bankruptcy court to dismiss a case for cause after notice and hearing); *In re Scotto*, No. 809-75956 (REG), 2010 WL 1688743, at *9 (Bankr. E.D.N.Y. Apr. 26, 2010)

---

[12] Congress protected against such bad-faith filings by providing additional restrictions on the imposition of an automatic stay for debtors who have filed Chapter 7, 11, or 14 petitions within the past year that have been dismissed. *See* 11 U.S.C. § 362(c)(3). For these frequent filers, any automatic stay will be terminated after 30 days unless the petitioner can show good cause. *See id.*; H.R. Rep. No. 109-31, at 70 (2005) (explaining that this provision was enacted pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 to reduce abusive filings); Laura B. Bartell, *Staying the Serial Filer - Interpreting the New Exploding Stay Provisions of S 362(c)(3) of the Bankruptcy Code*, 82 Am. Bankr. L.J. 201, 224 (2008) ("The Senate Judiciary Committee report stated that [Section 362(c)(3)] was intended to 'reduc[e] abusive uses of the Bankruptcy Code.'" (alteration in original) (citation omitted)).

(compiling cases dismissing petitions filed under deficient powers of attorney); *In re Curtis*, 262 B.R. 619, 622–24 (Bankr. D. Vt. 2001) (discussing, on a motion to dismiss, whether a "general power of attorney is sufficient to authorize the attorney-in-fact to file a petition on behalf of a debtor"); *In re O'Connor*, No. 08-16434, 2009 WL 1616105, at *2 (Bankr. N.D. Ohio Feb. 27, 2009) (determining, on a motion to dismiss, "whether the debtor's power of attorney is specific enough to authorize her daughter to sign a bankruptcy petition on the debtor's behalf"); *In re Nakano*, No 19-11179 (RK), 2019 WL 2896199, at *5, *10 (Bankr. C.D. Cal. June 26, 2019) (explaining, in the context of a power of attorney that did explicitly authorize the filing of bankruptcy, that "[i]f authority to file a bankruptcy petition to commence a Chapter 7 bankruptcy case is insufficient, this is cause for dismissal of a Chapter 7 bankruptcy"); *In re Rice*, 521 B.R. 405, 408 (Bankr. N.D. Ga. 2014) (discussing defective power of attorney in the context of a motion to dismiss a bankruptcy case). But, as *Zarnel* establishes, such defects do not prevent an automatic stay from coming into effect once the petition is filed.

The Court therefore concludes that an automatic stay came into effect on July 11, 2024, when Abadi filed her petition. In so doing, it joins the Second Circuit and a growing consensus of courts holding that an automatic stay applies "the moment a petition is filed." *See Sotomayor-Serra v. Swiss Chalet Inc*., No. 12-CV-1469 (JAG), 2012 WL 6738310, at *1 (D.P.R. Dec. 28, 2012) (citing *Zarnel*, 619 F.3d 156); *In re Atkinson*, No. 22-31746 (KLT), 2022 WL 17722840, at *3 (Bankr. D. Minn. Dec. 15, 2022) ("[T]he automatic stay went into effect upon the commencement of this [c]ase." (citing *Zarnel*, 619 F.3d 156)); *In re Bolling*, No. 08-0746, 2009 WL 150629, at *1–2 (Bankr. D.D.C. Jan. 21, 2009) ("[T]he debtor *does* benefit from the filing of an invalid petition [for failure to obtain prepetition credit counseling] as it gains the debtor the benefit of the automatic stay."); *In re Jackson*, No. 08-0755, 2009 WL 150628, at *2 (Bankr.

17

D.D.C. Jan. 21, 2009) (same); *Wekell*, 14 F.3d at 33 (concluding that "the Bankruptcy Code's automatic stay goes into effect [even] when the filing of the petition is ultra vires").

2.    <u>The Automatic Stay Applies to the State Contempt Proceedings</u>

"Generally, actions for civil contempt are considered private collection devices subject to the automatic stay while criminal contempt proceedings are not." *In re White*, 478 B.R. 177, 181 (Bankr. S.D.N.Y. 2012).  To determine whether a contempt order is civil or criminal, the Court looks to the law governing the underlying order, "the provisions of the order itself[,] and its surrounding circumstances." *See In re Maloney*, 204 B.R. 671, 674 (Bankr. E.D.N.Y. 1996). Relevant here, New York recognizes two kinds of contempt orders, civil and criminal.  Under its civil contempt powers, a New York court may "punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a right or remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced." N.Y. Jud. Law § 753(A).  Under its criminal contempt powers, a court may punish "a person guilty of," *inter alia*, "[w]ilful disobedience to its lawful mandate." *Id.* § 750(A).

The primary distinction between both forms of contempt is "the rights that are being vindicated and the level of willfulness of the conduct." *White*, 478 B.R. at 181 (citing *McCormick v. Axelrod*, 59 N.Y.2d 574, *amended*, 60 N.Y.2d 652 (1983)).  "Civil contempt has as its aim the vindication of a private right of a party to litigation," *McCormick*, 59 N.Y.2d at 582–83; *McCain v. Dinkins*, 84 N.Y.2d 216, 226 (1994), and thus "operates to coerce compliance with a court order for the other party's benefit," *Maloney*, 204 B.R. at 674; *see Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911) (describing "imprisonment for civil contempt" as "coercing the defendant to do what he had refused to do").  Consistent with this aim, an individual imprisoned for civil contempt can "discharge himself at any moment by doing what he had previously refused to do." *See Gompers*, 221 U.S. at 442; *Rubackin v. Rubackin*, 875 N.Y.S.2d 90, 94 (2d Dep't

18

2009) (same); *White*, 478 B.R. at 183 ("The contemnor holds the keys to his jail cell, a sure sign that the contempt is civil."); *People v. Sweat*, 24 N.Y.3d 348, 356 (2014) (similar). Criminal contempt, by comparison, vindicates "an offense against public justice and is utilized to protect the dignity of the judicial system and to compel respect for its mandates." *McCormick*, 59 N.Y.2d at 583. Because it primarily aims to "sanction" the offender, criminal contempt is generally "imposed for a definite term . . . without the possibility of shortening that term by purging the contempt." *Rubackin*, 875 N.Y.S.2d at 94; *Maloney*, 204 B.R. at 674 (same).

The Court finds that Abadi's incarceration was the product of civil, not criminal, contempt. Throughout Justice Bannon's Contempt Order, she focused on the vindication of *Honeedew*'s rights, specifically, its right to the Confession of Judgment and how its ability to collect that judgment was "prejudiced by the [Abadis'] failure to comply [with court orders]." (B.R. 201); *see* N.Y. Jud. Law § 753(A). The Order documented the "extensive enforcement efforts on the part of [Honeedew]," including "17 motions in the action alone over the course of more than six years of litigation." (B.R. 195.) Honeedew, the Order found, incurred "$57,000 in attorney's fees for New York counsel, as well as attorney's fees and costs for Argentine counsel in the sum of $150,000" in combatting the Abadis' attempts to nullify the judgment in Argentina. (B.R. 198.) And when a court in Argentina questioned the validity of the judgment, Honeedew had to "post a [$ ]14,000 bond to pursue enforcement of the judgment." (*Id.*) Although the Order charged the Abadis with being "willfully contemptuous" of court orders, (*see* B.R. 200, 202), its "purge" provision supports the conclusion that its primary goal was to coerce the Abadis' compliance, not penalize them for failing to abide by the court's orders: the Order provided that the Abadis' four-month incarceration would end immediately "upon proof of payment to [Honeedew] of the purge amount of $4,603,408.23, plus statutory interest of 9% from May 17, 2017," (B.R. 203, 212). "If

19

the order were 'simply to punish' [the] Debtor" for several years of evasion, "it surely would not have contained a provision by which Debtor could have purged the contempt." *In re Siskin*, 231 B.R. 514, 519 (Bankr. E.D.N.Y. 1999).

Because the "provisions of the order itself and its surrounding circumstances" establish that Abadi was incarcerated to coerce compliance with court orders for Honeedew's benefit, *see Maloney*, 204 B.R. at 674, the Court concludes that the State Contempt Proceedings and the resulting Contempt Order were civil in nature and were not the "continuation of a criminal action or proceeding against the debtor," *see* 11 U.S.C. § 362(b)(1), and therefore, the automatic stay applied and should have led to Abadi's release from prison. [13]

## II.   Sanctions

Having concluded that an automatic stay took effect on July 11, 2024, when Abadi filed her petition for bankruptcy, the Court next turns to whether actual and punitive damages sanctions were warranted because Honeedew violated the stay.  To obtain damages for a stay violation, there must be (1) a willful violation of the automatic stay; (2) that caused actual damages; and, if the plaintiff seeks punitive damages, (3) appropriate circumstances exist to award punitive damages. *See* 11 U.S.C. § 362(k); *In re Morway*, No. 02-10009, 2002 WL 34438674, at *3 (Bankr. D. Vt. Mar. 8, 2002) (setting out similar elements: a willful violation that injured the individual seeking damages); *In re Crowder*, No. 16-20440-PRW, 2016 WL 3453214, at *2 (Bankr. W.D.N.Y. June 16, 2016) (same).  For the following reasons, the Court determines that Honeedew willfully violated the stay because it failed to assist in Abadi's release from Rikers and, in fact, raised

---

[13] Contrary to what Justice Bannon interpreted Pick and Slarskey to argue, an automatic stay does *not* necessarily mean that "everything is stopped and frozen" and, as a result, "nothing can be done," including releasing a debtor from contempt-related incarceration. (*See* B.R. 127.) Where, as here, the "status quo" would leave Abadi subject to continued enforcement attempts, the automatic stay required Justice Bannon to take affirmative action. *See infra* pp. 22–24.

20

arguments before the State Supreme Court that encouraged it to continue its contempt proceedings. Although the Court agrees that actual and punitive damages were warranted, for the following reasons, it must vacate and remand the awards for recalculation.

### A.    Willful Violation of the Stay

Honeedew first asserts that it did not willfully violate the stay because it "took no position with respect to the automatic stay" before Justice Bannon.  (Sanctions Br., Dkt. 10, at ECF 26–28.)  For example, Honeedew claims that it appeared before Justice Bannon on July 15, 2024, *at the direction* of the court pursuant to a previously scheduled appearance, and *Justice Bannon* made the decision to continue Abadi's confinement at Rikers notwithstanding the automatic stay.  (*See id.* at ECF 25 n.6, 28.)  Honeedew also rejects the notion that it violated the stay by failing "to seek the Debtor's release."  (*Id.* at ECF 27 n.7.)  For the following reasons, the Court disagrees.

A violation of a stay is willful where a creditor "knew of the automatic stay," *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1104–05 (2d Cir. 1990) (quoting *In re Bloom*, 875 F.2d 224, 227 (9th Cir. 1989)), and had "general intent simply to perform the act found to violate" the stay, *Weber*, 719 F.3d at 82.  "Not even a good faith mistake of law or a legitimate dispute as [whether an automatic stay is in effect] relieve a willful violator of the consequences of his act." *See In re Sullivan*, 367 B.R. 54, 62 (Bankr. N.D.N.Y. 2007) (citation omitted); *In re Campbell*, 398 B.R. 799, 812 (Bankr. D. Vt. 2008) (finding a bank's violation of the stay to be willful even where it asserted "it had no reason to believe the automatic stay was still in place").

As several courts in this Circuit have held, "upon receiving actual notice of the commencement of a bankruptcy case, a creditor has an affirmative duty under [Section] 362 to take the necessary steps to discontinue its collection [or enforcement] activities against the debtor." *See In re Parry*, 328 B.R. 655, 659 (Bankr. E.D.N.Y. 2005); *In re Wright*, 328 B.R. 660, 663 (Bankr. E.D.N.Y. 2005); *Siskin*, 231 B.R. at 520.  Such necessary steps can include "halt[ing] or

revers[ing] pending state court actions," even those "commenced prior to the filing of a bankruptcy petition." *See In re Sucre*, 226 B.R. 340, 347 (Bankr. S.D.N.Y. 1998) (quoting *Matter of Sams*, 106 B.R. 485, 490 (Bankr. S.D. Ohio 1989)).  Similarly, a creditor's affirmative efforts to *perpetuate* collection and enforcement may violate an automatic stay.  *See In re Cohoes Indus. Terminal, Inc.*, 62 B.R. 369, 377 (Bankr. S.D.N.Y.) ("[C]reditors may not pursue contempt proceedings to enforce the collection of prepetition claims or to obtain possession of the property of the estate."), *aff'd*, 70 B.R. 214 (S.D.N.Y. 1986), *aff'd sub nom. In re Cohodes Indus. Terminal Inc.*, 831 F.2d 283 (2d Cir. 1987).  And a "failure to act by a creditor . . . where the creditor had knowledge of the bankruptcy filing," may also violate the automatic stay.  *See Wright*, 328 B.R. at 663; *see also Siskin*, 231 B.R. at 520 (explaining that acts in violation of a stay include affirmative actions as well as "refusal or failure to take action" (citation and internal quotation marks omitted)).

The Court agrees that Honeedew had an "affirmative" obligation to seek the Debtor's release. Tr. at 40:19–22, *Bankr.* Dkt. 122 (reaching this conclusion).  Justice Bannon's Contempt Order was an effort to enforce—through the coercive measure of incarceration—a judgment.  *See* 11 U.S.C. § 362(a)(2); *In re Goodman*, 277 B.R. 839, 842 (Bankr. M.D. Ga. 2001) (similarly making this observation).  So long as Abadi's incarceration continued, so did the enforcement efforts.  Accordingly, to stay enforcement, Honeedew had to "take steps . . . to ensure that the incarceration for civil contempt [was] no longer enforced and that the Debtor [was] released from incarceration." *See In re Birchall*, No. 07-13232-WCH, 2007 WL 1992089, at *9 (Bankr. D. Mass. July 3, 2007) (reaching this conclusion based on a similar analysis); *Goodman*, 277 B.R. at 842–43 (making a similar observation).  *Siskin*, 231 B.R. 514, well-illustrates this obligation.  In that case, a debtor faced an outstanding Warrant of Arrest and Order of Commitment, both of which arose out of efforts to enforce two judgments against him.  *Id.* at 517.  After filing a petition for

bankruptcy, the debtor was incarcerated pursuant to the Order of Commitment, while the warrant remained outstanding. *Id.* Despite knowing that the petition was filed, both creditors did not take "any affirmative actions to obtain a stay or withdraw the Order of Commitment or the Warrant of Arrest." *Id.* Instead, the creditors "opposed [the] [d]ebtor's attempt to obtain a stay of the [w]arrant," and his "petition for release from jail." *Id.* The *Siskin* court held that the creditors violated the automatic stay because they failed to abide by their "affirmative obligation" to withdraw the Order of Commitment and "ensure that the outstanding Warrant of Arrest was not enforced." *Id.* at 520–21. "Once [the d]ebtor filed his petition[,] all actions to collect should have ceased." *Id.*

Honeedew shirked its affirmative obligation to seek Abadi's release. Honeedew became aware of Abadi's petition for bankruptcy on or about July 12, 2024, when informed by Abadi's bankruptcy counsel. (B.R. 109.) Despite being asked to cooperate to have Abadi "immediately released," (*id.*), Honeedew did not "tak[e] affirmative steps to assist [Abadi's counsel] in obtaining [her] release from Rikers," Tr. at 40:19–22, *Bankr.* Dkt. 122. To the contrary—Honeedew *actively discouraged* Abadi's release before Justice Bannon. *Id.* As the Bankruptcy Court correctly observed, Honeedew provided Justice Bannon with legal arguments suggesting that the automatic stay was *not* in place, such as by informing her that Honeedew had a "fundamental problem with the actual petition file" and that the power of attorney that Abadi had relied on to file her bankruptcy petition was not proper, thus rendering the bankruptcy filing a "nullity." (B.R. 125–26, 134.)[14] Honeedew also reinforced the incorrect notion that ordering Abadi's release would

---

[14] The Court is unconvinced by Honeedew's protestations that it did not willfully violate the stay because it genuinely had "extreme doubt as to the validity of the initial petition." (Sanctions Br., Dkt. 10, at ECF 27 n.7.) These doubts do not excuse violations of an automatic stay. As explained, the automatic stay comes into effect once a bankruptcy petition is filed, even if that petition is later found to be defective. *See supra* pp. 11–18. Ignorance of bankruptcy law,

violate the automatic stay.  (*See* B.R. 124 (Honeedew agreeing there was a "conundrum" because, on the one hand, "one argument is, we're stayed, you can't do anything," and the "other argument is [Abadi] is asking for relief from your prior order"); B.R. 128 (asserting that "[Abadi] cannot say [the proceeding] is stayed, but you have to do something at the same time")).)  And Honeedew effectively argued for Abadi's continued incarceration, asserting that letting "Abadi [out] until [the Bankruptcy Court] determine[d] if the bankruptcy petition was properly filed *does not seem appropriate under the circumstances.*"  (B.R. 126 (emphasis added).)  Indeed, it appears that Honeedew, in fact, persuaded Justice Bannon that she lacked the authority to release Abadi *because* of the stay.  (*See* B.R. 127, 129, 130 (Justice Bannon explaining, in declining to release Abadi, that "[a] release is an order, . . . the same thing as an order to produce," and that "nothing can be done in this case because there's a stay. . . . [E]verything is stopped and frozen").)  Because Honeedew failed to ensure that Justice Bannon's Contempt Order was not enforced and that Abadi was released from incarceration, it violated the automatic stay.  *See In re Valentine*, 611 B.R. 622, 651 (Bankr. E.D. Mo. 2020) (determining that, "by not assisting in the release of the Debtor from incarceration, the Defendants willfully violated the automatic stay"); *Siskin*, 231 B.R. at 520–21 ("[Creditor], with knowledge of Debtor's bankruptcy, at the very least had an obligation not to hinder Debtor's release.").

---

and the failure to educate oneself on the relevant law, does not excuse violations of a stay or render those violations not willful.  *See In re Weatherford*, 413 B.R. 273, 285 (Bankr. D.S.C. 2009) ("[I]gnorance of bankruptcy law does not excuse anyone involved in a willful violation." (citation omitted)); *In re Killmer*, 513 B.R. 41, 50–51 (Bankr. S.D.N.Y. 2014) (rejecting argument that stay violation was not willful because it was "caused by an incorrect interpretation of the law"); *Sullivan*, 367 B.R. at 62–63 (citing *In re Layton*, 220 B.R. 508, 517 (Bankr. N.D.N.Y. 1998) (holding that "a good faith mistake of law does not relieve a willful violator of the consequences of the act." (citations omitted))).

24

### B.    Actual Damages

Honeedew next contends that an award of actual damages was improper because Abadi's counsel was "overly litigious" in pursuing violations of the automatic stay. (Sanctions Br., Dkt. 10, at ECF 28–30.) Specifically, Honeedew contends that Abadi waited until one hour before the hearing to enforce the stay, on July 22, 2025, to correct the alleged defects related to her signature on the petition. (*See id.* at 28–29); Am. Pet., *Bankr.*, Dkt. 16. This delay "caused much of the cost," (Sanctions Reply, Dkt. 9, at 14), because Abadi could have "easily provided . . . information which may have caused Honeedew to affirmatively seek Mrs. Abadi's release," (Sanctions Br., Dkt. 10, at ECF 30). As further evidence of opposing counsel's excessive litigiousness, Honeedew points to the amount of time Abadi's counsel spent on certain tasks, such as the 2.5 hours it charged for sending an email to Honeedew informing it that a stay was in place. (Sanctions Reply Br., Dkt. 9, at 13.) These costs, it further maintains, "are routinely born by debtors." (Sanctions Br., Dkt. 10, at ECF 30.) For the reasons set forth below, the Court concludes that actual damages are warranted but finds that Judge Mazer-Marino abused her discretion by awarding damages that did not occur *as a result* of Honeedew's violation of the automatic stay.

Actual damages include compensatory damages for the harm suffered from the violation of the stay, as well as attorney's fees. *See* 11 U.S.C. § 362(k)(1) (providing for recovery of "actual damages, including costs and attorneys' fees"); *In re Prusan*, 495 B.R. 203, 208 (Bankr. E.D.N.Y. 2010) (explaining that "attorneys' fees and costs are recoverable under [Section] 362(k)"); *In re Beebe*, 435 B.R. 95, 101 (Bankr. N.D.N.Y. 2010) (same); *In re Sturman*, No. 10-CV-6725 (RJS), 2011 WL 4472412, at *3 (S.D.N.Y. Sep. 27, 2011) (same). Attorneys' fees may qualify as actual damages, "even in the absence of pecuniary loss to the debtor," where those fees were reasonable and where those fees were "necessary to (1) stop an ongoing stay violation, (2) undo the effects of a stay violation, or (3) recover pre-litigation actual damages." *In re Greene*, No. 17-CV-20543

25

(PRW), 2017 WL 3588627, at *2 (Bankr. W.D.N.Y. Aug. 18, 2017) (citing *Crowder*, 2016 WL 3453214, at *3); *In re Hall*, 518 B.R. 202, 208 n.7 (Bankr. N.D.N.Y. 2014) ("[A]ctual damages for a creditor's violation of the stay . . . often equates with recovery of the attorney's fees and costs incurred to stop the violation.").[15]  Awards of such fees are tempered by courts' "reluctance to foster a 'cottage industry' built around satellite fee litigation," and therefore, a court may "reduce[] awards of attorneys' fees in situations where unnecessary costs were incurred." *In re Robinson*, 228 B.R. 75, 85 (Bankr. E.D.N.Y. 1998) (citations omitted).

Here, Abadi's attorneys sought $21,642.50 for 45.1 billable hours, allocated as follows: 2.5 hours researching automatic stay law and communicating with Honeedew about the effect of the automatic stay; 4.8 hours preparing for the hearing before the State Supreme Court and appearing before the State Supreme Court; 1 hour reviewing the transcript of the hearing; 8 hours drafting the motion to enforce the automatic stay and for sanctions; 10.4 hours preparing for and appearing at the order to show cause hearing; 2.8 hours securing Abadi's release from Rikers; 1.6 hours researching Honeedew's appeal of the Bankruptcy Court's Enforcement Order; and 14 hours drafting the motion for sanctions. Sanctions Mot., *Bankr.*, Dkt. 67, at 11–12.[16]

As a threshold matter, the Court rejects Honeedew's insistence that the debtor bears "all of the costs and briefing" and that Abadi caused most of the costs in this case. (*See* Sanctions Br. Dkt. 10, at ECF 29–30; Sanctions Reply, Dkt. 9, at 13–14.)  It is well established that the party *violating the automatic stay* bears the cost of actual damages, not the debtor.[17]  *In re Grinspan*,

---

[15] The Court makes no determination as to whether Abadi had pecuniary losses or compensable harm, as Abadi did not seek—and thus the Bankruptcy Court made no finding as to—damages related to these harms. Sanctions Mot., *Bankr.*, Dkt. 67, at 13 n.6.

[16] Honeedew does not object to the hourly rate charged by Abadi's attorneys.

[17] Honeedew misapplies relevant caselaw when it claims that debtors usually bear these costs. (Sanctions Br., Dkt. 10, at ECF 29–30.)  The cases to which Honeedew cites discuss how

26

597 B.R. 725, 730 (Bankr. E.D.N.Y. 2019) ("Defendants willfully violated the automatic stay and, by statute, are liable for actual damages . . . ."). And, in fact, it was Honeedew, not Abadi's counsel, that was responsible for much of the fees incurred: Abadi's counsel, by informing Honeedew of the automatic stay's effect, "provided notice to Honeedew [along with] information which may have caused Honeedew to affirmatively seek Mrs. Abadi's release." (*Contra* Sanctions Br., Dkt. 10 at ECF 30); *see supra* p. 11–18 (explaining that the filing of a petition triggers an automatic stay). Instead, Honeedew incorrectly insisted that the automatic stay did not apply and encouraged Abadi's continued incarceration in violation of the stay, thereby forcing Abadi's counsel to make further expenditures to affirmatively enforce the stay four days later. (B.R. 146–47 (declaration supporting Abadi's motion to enforce stay)); *see* Sanctions Mot., *Bankr.*, Dkt. 67, 11–12 (documenting fees incurred in enforcing the stay and securing Abadi's release); *In re Voll*, 512 B.R. 132, 141–42 (Bankr. N.D.N.Y. 2014) (rejecting argument that debtors' counsel "unnecessarily increased the costs of litigation" because creditor's "elect[ion] to oppose Debtors' motion on the basis that no violation of the automatic stay occurred . . . requir[ed] Debtors' counsel to prove the violation"); *Robinson*, 228 B.R. at 86 ("Where there is a willful violation, the violator must compensate a debtor's counsel for his reasonable response to that violation. To deny fees incurred litigating the motion would inappropriately saddle a debtor or debtor's attorney with such expenses.").[18]

---

civil contempt orders require the contemnor to bear the cost to *purge* that contempt. *See In re Burgess*, 503 BR 154, 158 (Bankr. M.D. Fla. 2014); *Maloney*, 204 B.R. at 674–75; *In re Moon*, 201 B.R. 79, 84–86 (Bankr. S.D.N.Y. 1996), *rev'd*, 211 B.R. 483 (S.D.N.Y. 1997). These cases do not discuss damages under Section 362(k) and thus do not support the proposition that the debtor bears the costs related to enforcing a stay.

[18] Honeedew's other allegations of overly litigious conduct are also unsupported by the record. Judge Mazer-Marino found—and Honeedew does not meaningfully contest—that Abadi did not wait to amend her bankruptcy petition to make "herself a more sympathetic character";

27

Although the Court agrees that Abadi's counsel is entitled to some measure of actual damages, it finds that Judge Mazer-Marino erred in one respect in her calculation of actual damages. It is well-established that the actual damages claimed must be *caused* by the violation of the automatic stay. *See Morway*, 2002 WL 34438674, at *3 (requiring, *inter alia*, violation to *cause* injury); *Crowder*, 2016 WL 3453214, at *2 (same); *In re Sucre*, 226 B.R. at 350 (same); *see also In re Laskaratos*, 605 B.R. 282, 300 (Bankr. E.D.N.Y. 2019) (describing compensatory damages as seeking to "reimburse the costs caused by the stay violation"). As Judge Mazer-Marino found, Honeedew willfully violated the automatic stay based on its conduct at the July 15, 2024 hearing before Justice Bannon. (*See, e.g.*, B.R. 295–96.) However, the 2.5 hours Abadi's counsel spent researching automatic stay law and communicating with Honeedew about the effect of the automatic stay and the 4.8 hours spent preparing for and attending the hearing before the State Supreme Court occurred *before* Honeedew willfully violated the stay and cannot be attributed to Honeedew's actual violation of the automatic stay.[19] Sanctions Mot., *Bankr.*, Dkt. 67, at 11. Because Judge Mazer-Marino imposed actual damages for costs not caused by the violation of the automatic stay, she abused her discretion. *See Sucre*, 226 B.R. at 350 (declining to award damages for a petitioner's post-petition late mortgage charges because the petitioner failed to prove that a willful violation of a stay was the proximate cause of those charges). Accordingly, the Court

---

rather, the conditions of Abadi's incarceration made it difficult to sign the requisite paperwork. Tr. at 47:9–16, *Bankr.*, Dkt. 122; (B.R. 1218–19).

[19] While the Court recognizes that the research conducted by Abadi's counsel regarding the automatic stay and its effect and scope was arguably related to policing Honeedew's later violation of it, that research was not *necessitated* by Honeedew's violation, rather it was necessitated by Abadi's decision to file for bankruptcy. In other words, regardless of Honeedew's actions after Abadi filed for bankruptcy, Abadi's counsel would have had to do this research.

vacates the award of actual damages and remands this case for proceedings consistent with this opinion.

Because Abadi does not seek compensatory damages, the Bankruptcy Court should give particular scrutiny, on remand, to the reasonableness and necessity of the fees sought.  As courts within this Circuit have noted, concerns "about the propriety of awarding fees in the absence of other actual damages is particularly compelling where . . . the only fees and costs at issue were expended not in efforts to withdraw the offending judgment or motion or to halt the offending conduct, but in bringing a motion for damages under [Section] 362." *See, e.g.*, *Sturman*, 2011 WL 4472412, at *4; (Sanctions Reply, Dkt. 9, at 13 (same)).  At the same time, courts in this Circuit are split as to whether fees under Section 362(k) *only* extend to "the efforts necessary to remedy the [stay] violation (and therefore do not extend to fees incurred to collect damages)." *Compare Surprenant v. Druckman & Sinel, LLP*, No. 1:10-CV-0003 (GTS), 2010 WL 11680167, at *2 (N.D.N.Y. Sep. 30, 2010) (agreeing that an "attorney may not recover the fees that were incurred pursuing the adversary proceeding based on a violation of the stay once the violation of the stay ended"), *with In re Henderson*, No. 1-08-48268-JMM, 2026 WL 74742, at *12 (Bankr. E.D.N.Y. Jan. 9, 2026) ("[A] debtor can also incur attorney's fees in court by pursuing an action to end a stay violation and to recover damages." (citation omitted)), *and In re Arcapita Bank B.S.C.(c)*, 648 B.R. 489, 504 (Bankr. S.D.N.Y. 2023) ("[C]ompensatory damages for violation of the automatic stay include fees and expenses incurred in trying to enforce the stay . . . as well as in proving and enforcing a sanction for other damages caused by the violation." (citation omitted)).  The Ninth and Eleventh Circuits have interpreted Section 362(k) "as authorizing an award of attorney's fees incurred in prosecuting an action for damages under the statute." *In re Schwartz-Tallard*, 803 F.3d 1095, 1099–101 (9th Cir. 2015) ("Congress could not have expected [Section] 362(k) to serve as

29

an effective deterrent unless it authorized recovery of the attorney's fees incurred in prosecuting an action for damages."); *In re Horne*, 876 F.3d 1076, 1080–82 (11th Cir. 2017) ("[N]othing in the text of Section 362(k)(1) limits the scope of attorneys' fees to solely ending the stay violation.").

Here, although Abadi's counsel does not seek damages *solely* for pursuing sanctions,[20] a large portion of the requested fees—approximately 30%—pertain solely to pursuing sanctions. Sanctions Mot., *Bankr.*, Dkt. 67, at 12 (documenting 14 hours spent on drafting briefing in support of an award of damages).  Because the Court vacates the Bankruptcy Court's fee award for the reasons discussed above, it expresses no opinion as to whether the fees Abadi's counsel incurred in pursuing sanctions were necessary or reasonable, and leaves that determination to the Bankruptcy Court on remand.[21]

### C.    Punitive Damages

Courts in this Circuit have determined that "[p]unitive damages . . . are only appropriate where the stay violation was conducted in bad faith, with malice, or in a particularly egregious manner."  *In re Jean-Francois*, 532 B.R. 449, 454, 458 (Bankr. E.D.N.Y. 2015) (quoting *In re Ebadi*, 448 B.R. 308, 320 (Bankr. E.D.N.Y. 2011)); *Laskaratos*, 605 B.R. at 300, 313; *see*

---

[20] *Compare* Sanctions Mot., *Bankr.*, Dkt. 67, at 11–12 (requesting fees for drafting the motion to enforce the stay and preparing for Honeedew's appeal of the Enforcement Order), *with Crowder*, 2016 WL 3453214, at *1 (denying fees motion because fees sought were solely for bringing sanctions motion and were "not necessary to stop an ongoing stay violation, to undo the effects of a stay violation, or to recover pre-litigation actual damages"), *and In re DiPietro*, No. 17-CV-9423 (KMK), 2019 WL 457601, at *5 (S.D.N.Y. Feb. 5, 2019) (finding bankruptcy court abused its discretion by awarding fees that represented only the costs in bringing contempt/sanctions motion).

[21] The number of hours an attorney spends on a particular task is, of course, subject to review for reasonableness and necessity. *See, e.g.*, *Greene*, 2017 WL 3588627, at *3–4 (awarding fees for four hours of attorney time, despite claim that attorney spent five hours litigating a motion, based on determination that four hours was a reasonable amount of time to spend on the motion).

30

*Crysen/Montenay Energy Co.*, 902 F.2d at 1105 ("An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages . . . ."). To make this determination, bankruptcy courts look to five factors: (1) "the nature of the creditor's conduct," (2) "the creditor's ability to pay," (3) "the motives of the creditor," (4) "any provocation by the debtor," and (5) "the creditor's level of sophistication." *Jean-Francois*, 532 B.R. at 459 (citing *In re Salov*, 510 B.R. 720, 734 (Bankr. S.D.N.Y. 2014)); *In re Cohen*, 279 B.R. 626, 638 (Bankr. N.D.N.Y. 2002). Mistakes of law as to the creditor's obligation related to the automatic stay, or even a "callous disregard" for the automatic stay, do not meet this high threshold. *See Adomah,* 368 B.R. at 39 ("[E]ven callous disregard is an insufficient basis upon which to award punitive damages because it does not rise to the level of bad faith or maliciousness."); *Ebadi*, 448 B.R. at 320 (denying punitive damages where stay violation was not conducted in "bad faith, with malice, or in a particularly egregious manner"); *Grinspan*, 597 B.R. at 744 (same).

The amount of punitive damages imposed must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Jean-Francois*, 532 B.R. at 460 (quoting *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)). "In other words, punitive damages should be awarded in the amount that is needed to deter future stay violations of this kind." *Henderson*, 2026 WL 74742, at *16 (quoting *Jean-Francois*, 532 B.R. at 460); *Sturman*, 2011 WL 4472412, at *5; *see also Crysen/Montenay Energy Co.*, 902 F.2d at 1105 (explaining that the standard for imposing punitive damages "encourages would-be violators to obtain declaratory judgments before seeking to vindicate their interests in violation of an automatic stay"). New York bankruptcy courts "often assess awards of punitive damages that are reasonably proportionate to the actual damages." *See In re Westridge*, No. 07-35257, 2009 WL 3491164, at

31

*4 (Bankr. S.D.N.Y. Oct. 23, 2009) (compiling cases); *cf. State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003) ("[C]ourts must ensure that the measure of [punitive damages] is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered"); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580–82 (1996) ("The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree.").

The Court rejects Honeedew's contention that Judge Mazer-Marino's award did not rest on a finding of malicious conduct. (*See* Sanctions Br., Dkt. 10, at 26.)  In deciding to award punitive damages, Judge Mazer-Marino considered the relevant factors.  She found that Honeedew was a sophisticated entity "represented by competent counsel and bankruptcy counsel," Tr. at 51:10, *Bankr.*, Dkt. 122—in other words, it should have "underst[oo]d the consequences of violating the automatic stay," *see Jean-Francois*, 532 B.R. at 460.  While acknowledging that Abadi "ha[s] a history of avoiding collection efforts," Judge Mazer-Marino also found that Honeedew was not provoked by Abadi's attempts to secure protection from the automatic stay. Tr. at 50:14–19, *Bankr.*, Dkt. 122.  Despite noting that Honeedew did not "go as far as" some creditors, such as "actively pursuing a lawsuit" in violation of a stay, *id.* at 49:21–50:1, Judge Mazer-Marino emphasized her belief that Honeedew "intended to keep the debtor [Abadi] in jail" solely for the purpose of getting paid and that Honeedew "took this action[, violating the automatic stay,] because [it] wants to get paid," *id.* at 50:8–10.  Judge Mazer-Marino concluded that there was "no reason to believe that [Honeedew] does not have the ability to pay substantive damages" to Abadi. *Id.* at 50:6–8.[22]  Judge Mazer-Marino's findings were sufficient to establish "malice or

---

[22] The Court accordingly rejects Honeedew's argument that the punitive damages award is procedurally improper because the Bankruptcy Court failed to consider Honeedew's financial capacity. (Sanctions Br., Dkt. 10, at ECF 32–33.)  The record indicates that Honeedew did not

32

bad faith as such conduct is understood in this Circuit." *See In re Crawford*, 476 B.R. 83, 87 (S.D.N.Y. 2012) (citing *Adomah*, 368 B.R. at 139); *see also In re Repine*, 536 F.3d 512, 515–17, 521 (5th Cir. 2008) (concluding that attorney's opposition to the suspension of civil commitment of a debtor constituted egregious conduct warranting imposition of punitive damages); *In re Goodson*, No. 17-41820-JJR, 2018 WL 722461, at *13 (Bankr. N.D. Ala. Feb. 5, 2018) (imposing $15,000 in punitive damages for creditor's choice to proceed with a lawsuit "knowing it would likely conclude with the Debtor's incarceration").

However, because the Court is vacating the actual damages award, it also vacates and remands the award of punitive damages to give the Bankruptcy Court the opportunity to ensure that punitive damages are reasonably proportionate to the actual damages that Abadi suffered as a result of Honeedew's willful violation of the stay. *See, e.g.*, *In re Bailey*, 518 B.R. 594, 601 (D. Idaho 2014) (remanding punitive damages award "so that the bankruptcy court can decide punitive damages after determining the new compensatory damages award"); *In re Sallee*, 286 F.3d 878, 884 (6th Cir. 2002) (similar); *In re Moon*, No. 13-BK-12466-MKN, 2021 WL 62629, at *9 (B.A.P. 9th Cir. Jan. 7, 2021) (similar); *see also Westridge*, 2009 WL 3491164, at *4 (observing that New York bankruptcy courts "often assess awards of punitive damages that are reasonably proportionate to the actual damages" (compiling cases)).

On remand, the Court encourages the Bankruptcy Court to clarify how it determined that punitive damages in the amount of $75,000 was sufficient to *deter* Honeedew from further stay violations, as it is not apparent from the record how the Bankruptcy Court reached this conclusion.

---

argue that it was unable to pay punitive damages to Abadi, nor did Honeedew present Judge Mazer-Marino with any financial records or information establishing its inability to pay, leading Judge Mazer-Marino to find that Honeedew had the ability to pay damages to Abadi. Tr. at 50:6–8, *Bankr.*, Dkt. 122.

The Court notes that, although Judge Mazer-Marino acknowledged that the primary purpose of punitive damages is to change the creditor's behavior, *see* Tr. at 48:10–12, *Bankr.*, Dkt. 122, her award of $75,000 in punitive damages—calculated at $7,500 for each day Abadi was incarcerated after the stay came into effect—appears to reflect an assessment of *actual* damages Abadi theoretically suffered because of her unlawful continued incarceration.  At one point, Judge Mazer-Marino suggested as much, noting that Rikers, "a jail of particular renown," "is in danger of being taken over by Federal receivers or has been taken over by Federal receivers due to the conditions in the prison" and asking "how much would somebody have to pay you to spend ten days in Rikers?" Tr. at 46:10–14, 51:2, *Bankr.*, Dkt. 122.  Calculating punitive damages in this manner—by imposing a certain sum for each day incarcerated—is typically a method of assessing *compensatory* damages, as it quantifies the harms of each day of incarceration.[23]  Punitive damages, however, are not compensation for injury. *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 48 (1979); *see Carver*, 1990 WL 10007400, at *6 (explaining that punitive damages "are not

---

[23] *See Goodson*, 2018 WL 722461 (imposing $5,000 for each day of incarceration as actual damages, and imposing punitive damages of $15,000 without specifying whether this latter amount was imposed per day of incarceration); *In re Sterling*, 140 F.4th 924, 930, 933–34 (7th Cir. 2025) (affirming compensatory damages award of $6,000 for each day debtor was incarcerated in violation of a discharge order as a measure of emotional distress); *Valentine*, 611 B.R. at 651–52 (awarding "$400.00 ($100.00 for each night of incarceration) [as] a reasonable value based on the limited evidence of the Debtor's emotional distress related to the violations of the automatic stay"); *In re Carver*, No. 89-10203, 1990 WL 10007400, at *6 (Bankr. S.D. Ga. Dec. 28, 1990) (valuing "loss of freedom" at $1,000 per day).

One bankruptcy case addressing a similar issue, *In re Kimbler*, imposed *punitive* damages "of $1,000.00 for each of the sixteen days that the Debtor was incarcerated," 618 B.R. 437, 443–44 (Bankr. E.D.N.C. 2020).  However, the bankruptcy court imposed these damages only after determining debtor was "not able to work and earn income during her time of incarceration" and suffered "extensive, deep, harmful, and significant emotional distress"—in other words, after determining the debtor was entitled to compensatory damages. *Id.*  Abadi, in comparison, did not seek compensatory damages arising out of any emotional distress she suffered while incarcerated. Sanctions Mot., *Bankr.*, Dkt. 67, at 13 n.6.

34

intended to compensate victims, but rather are private fines, awarded in addition to what is necessary to compensate the victim"); *In re Spires*, No. 90-10115, 1991 WL 11002451, at *2 (Bankr. S.D. Ga. Feb. 21, 1991) (same); *In re Pawlowicz*, 337 B.R. 640, 648 (Bankr. N.D. Ohio 2005) (same). Because it is not apparent from the record how the Bankruptcy Court determined that punitive damages in the amount of $75,000 was sufficient to *deter* Honeedew, the Court encourages the Bankruptcy Court to clarify the basis for punitive damages on remand. *See In re DiBattista*, 615 B.R. 31, 44 (S.D.N.Y. 2020) (encouraging a bankruptcy court, on remand, to clarify the basis of an award and how the calculation of damages was reached).

### III.    Honeedew's Procedural Challenge to the Sanctions Order

Finally, Honeedew contends that the Bankruptcy Court's imposition of sanctions violated due process because it "failed to provide Honeedew with an opportunity to present evidence, cross-examine witnesses, or contest the allegations before imposing punitive damages." (Sanctions Br., Dkt. 10, at ECF 31–32.) Not so. The Second Circuit has repeatedly held that bankruptcy courts need not provide a "full evidentiary hearing" before imposing sanctions. *See In re Stein*, 127 F.3d 292, 295 (2d Cir. 1997); *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 117 (2d Cir. 2000) (same). All that due process requires is notice and an opportunity to respond. *60 E. 80th St. Equities, Inc.*, 218 F.3d at 117. Honeedew does not claim that the Bankruptcy Court otherwise deprived it of "notice and an opportunity to respond" by denying it the opportunity to brief and argue the punitive damages issue. *See Stein*, 127 F.3d at 294.

**CONCLUSION**

For the forgoing reasons, the Court affirms the Bankruptcy Court's Enforcement Order but vacates the Bankruptcy Court's award of actual and punitive damages in the Sanctions Order, and remands this case for a re-calculation of damages consistent with this opinion.  The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

/s/ *Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  March 30, 2026
Brooklyn, New York